131 Nev., Advance Opinion 38

# IN THE SUPREME COURT OF THE STATE OF NEVADA

EXCELLENCE COMMUNITY
MANAGEMENT, LLC, A NEVADA
LIMITED LIABILITY COMPANY,
Appellant,
vs.
KRISTA GILMORE, INDIVIDUALLY;
AND MESA MANAGEMENT, LLC, A
NEVADA LIMITED LIABILITY
COMPANY,
Respondents.

No. 62189

FILED

JUN 2 5 2015


TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a district court order denying a preliminary injunction in an employment matter. Eighth Judicial District Court, Clark County; Michael Villani, Judge.

*Affirmed.*

Durham Jones & Pinegar and Michael D. Rawlins and Bradley S. Slighting, Las Vegas,
for Appellant.

Alessi & Koenig, LLC, and Huong X. Lam, Las Vegas,
for Respondents.

BEFORE HARDESTY, C.J., PARRAGUIRRE and CHERRY, JJ.

*OPINION*

By the Court, HARDESTY, C.J.:

In this appeal, we must determine whether the sale of 100 percent of the membership interest in a limited liability company affects

the enforcement of an employee's employment contract containing a restrictive covenant. We conclude that it does not because such a sale does not create a new entity. Thus, we extend our holding in *HD Supply Facilities Maintenance, Ltd. v. Bymoen*, 125 Nev. 200, 210 P.3d 183 (2009), and agree with the Pennsylvania Superior Court that the sale of membership interests in a limited liability company is "akin to a sale of stock [in a corporation] rather than an asset sale." *Missett v. Hub Int'l Pa., LLC*, 6 A.3d 530, 537 (Pa. Super. Ct. 2010). Accordingly, the employer limited liability company may enforce a restrictive covenant in an employment contract without its employee's consent of assignment. However, we conclude that the district court in this case did not abuse its discretion in denying a preliminary injunction because appellant failed to demonstrate irreparable harm for which compensatory damages are an inadequate remedy. We affirm.

## FACTS AND PROCEDURAL HISTORY

Excellence Community Management (ECM) is a Las Vegas-based Nevada limited liability company (LLC) that provides condominium and homeowners' association (HOA) management services. Respondent Krista Gilmore was employed by ECM as a community association manager from 2005 to 2012 and was directly responsible for managing multiple associations. In April 2011, Gilmore signed an employment agreement that prohibited her from revealing trade secrets and disclosing ECM's confidential information for a period of 24 months after termination of her employment. The employment agreement also included an 18-month nonsolicitation clause and an 18-month noncompetition clause, requiring Gilmore to refrain from soliciting persons or entities contractually engaged in business with ECM. The employment agreement did not include an assignment clause.

At the time Gilmore signed the employment agreement, ECM was owned and operated by Jamie and Warren McCafferty. In May 2011, 90 percent of the McCaffertys' membership interest in ECM was purchased by First Service Residential Management Nevada (FSRM). One year later, the McCaffertys sold or relinquished their remaining membership interest in ECM to FSRM. The purchase agreement between the McCaffertys and FSRM specifically stated that the McCaffertys "will sell, assign and transfer the [p]urchased [i]nterest to [FSRM], and [FSRM] will purchase the [p]urchased [i]nterest from the [McCaffertys], free and clear of any [e]ncumbrance."

In early June 2012, Gilmore submitted her resignation to ECM and informed ECM that, upon final termination of her employment, she would begin working for respondent Mesa Management, LLC. Upon receiving Gilmore's notification, ECM's president decided to terminate Gilmore. Approximately three weeks later, ECM sent Gilmore a cease-and-desist letter, which alleged that Gilmore violated her 2011 employment agreement by contacting ECM's clients to inform them she was no longer employed by ECM and soliciting them to hire Mesa. Notwithstanding ECM's cease-and-desist letter, Mesa's owner sent a solicitation letter to numerous HOA boards announcing the start of Gilmore's employment with Mesa.

ECM filed a complaint seeking damages and injunctive relief against Gilmore and Mesa, and subsequently filed a motion for a preliminary injunction to enforce the employment agreement pending the district court's resolution of the case. During the preliminary injunction hearing, the district court asked ECM whether, if successful on its case, money damages could be calculated and could make ECM whole. Counsel

conceded that money damages would make ECM whole, but also pointed to caselaw from other jurisdictions holding that irreparable harm is presumed where an employee has breached a restrictive covenant.

The district court denied ECM's motion for preliminary injunction for two reasons. First, the court relied upon *Traffic Control Services, Inc. v. United Rentals Northwest, Inc.*, 120 Nev. 168, 87 P.3d 1054 (2004), to conclude that the agreement was not assignable to FSRM absent a clause permitting the assignment or an agreement with the employee consenting to the assignment. Second, the district court determined that a preliminary injunction was unwarranted because ECM had failed to show irreparable harm for which compensatory damages were not an adequate remedy.

ECM appealed, arguing that the district court erred in relying on *Traffic Control* in denying ECM's motion for a preliminary injunction because the LLC membership sale that took place in this case was not an asset sale for which an employee must consent to the assignment of his or her employment agreement to the asset purchaser. Furthermore, ECM contends that the district court abused its discretion in determining that the requirements for a preliminary injunction were not met because there was insufficient evidence of irreparable harm.

*DISCUSSION*

ECM appeals the district court's denial of a preliminary injunction. A preliminary injunction is proper where the moving party can demonstrate that it has a reasonable likelihood of success on the merits and that, absent a preliminary injunction, it will suffer irreparable harm for which compensatory damages would not suffice. *See* NRS 33.010; *Boulder Oaks Cmty. Ass'n v. B & J Andrews Enters., LLC*, 125 Nev. 397, 403, 215 P.3d 27, 31 (2009). Because the district court has discretion in

determining whether to grant a preliminary injunction, this court will only reverse the district court's decision when "the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Boulder Oaks*, 125 Nev. at 403, 215 P.3d at 31 (internal quotation omitted). In an appeal from a preliminary injunction, this court reviews questions of law de novo. *Id.*

*The 100-percent membership sale of the LLC did not result in the creation of a new entity*

The district court relied upon *Traffic Control*, 120 Nev. 168, 87 P.3d 1054, to conclude that the employment agreement was not assignable to FSRM absent a clause permitting the assignment because a new entity was introduced after the sale. ECM argues that *HD Supply Facilities Maintenance, Ltd. v. Bymoen*, 125 Nev. 200, 210 P.3d 183 (2009), and the case it primarily relied upon, *Corporate Express Office Products, Inc. v. Phillips*, 847 So. 2d 406 (Fla. 2003), provide that in the type of corporate transaction where 100 percent of the shares of a corporation are sold, the enforceability of any restrictive covenants are unaffected, because under such circumstances, there is no new employer. ECM further argues that the membership interest sale of an LLC, such as was conducted here, is equivalent to a stock sale in a corporation, not an asset sale as was the case in *Traffic Control*. We agree and conclude that the 100-percent membership sale of the LLC that took place in this case is equivalent to the sale of 100 percent of the stock in a corporation. Neither transaction results in a new entity.

In *HD Supply*, we recognized that the rule of nonassignability of an employee's covenant not to compete, articulated in *Traffic Control*, was limited to asset purchase transactions. 125 Nev. at 203-04, 210 P.3d at 185. We explained that the *Traffic Control* rule was "grounded in the

law of contractual assignments," and as such, it "logically applies in the contractual setting of an asset purchase transaction because, in an asset purchase, 'the transaction introduces into the equation an entirely different entity, the acquiring business.'" *Id.* at 205, 210 P.3d at 186 (quoting *Corporate Express*, 847 So. 2d at 412). Thus, "the acquiring corporation in an asset purchase becomes, in effect, a wholly new employer," which makes it distinct from other corporate transactions, such as mergers, where the employer does not change. *Id.* at 206, 210 P.3d at 186-87.

In distinguishing between asset sales and mergers, this court relied upon *Corporate Express*'s discussion of "whether different forms of corporate transactions affect whether consent is necessary to effect a valid assignment of a covenant not to compete." *HD Supply*, 125 Nev. at 205-06, 210 P.3d at 186. In addition to analyzing mergers, the *Corporate Express* court also addressed 100-percent stock purchases. 847 So. 2d at 411. The court explained that, unlike in asset sales where an entirely different entity is introduced into the equation, in a 100-percent stock sale there is no new entity because "the existence of a corporate entity is not affected by changes in its ownership," and, instead, "the corporation whose stock is acquired continues in existence, even though there may be a change in its management." *Id.* at 411-12. While *HD Supply* did not discuss 100-percent stock sales because doing so was not relevant to the inquiry in that case, this court's adoption of the reasoning from *Corporate Express* also extends to 100-percent stock sales. 125 Nev. at 205-06, 210 P.3d at 186.

In this case there was not a 100-percent stock sale, but rather a 100-percent membership sale of an LLC. Gilmore contends that a 100-

percent membership sale of an LLC is more equivalent to an asset sale than a stock sale. Gilmore points out that the Nevada statutes on LLCs never use the word "stock" but instead purposefully define a new term, "member's interest." NRS 86.091. We disagree.

A "'[m]ember's interest'" is defined as "a share of the economic interests in a limited-liability company, including profits, losses and distributions of assets." NRS 86.091. However, Gilmore's argument fails to address the fact that LLCs, like corporations, have perpetual existence and are distinct from their managers and members. NRS 86.155; NRS 86.201(3). Those features mandate that we treat assignability of employment agreements in a sale of the LLC membership interests like we treat assignability of employment agreements in a stock sale. Even after the sale, the same employer exists. *See Missett v. Hub Int'l Pa., LLC*, 6 A.3d 530, 537 (Pa. Super. Ct. 2010) (holding that a company's purchase of all of the membership interests in an LLC was "akin to a sale of stock rather than an asset sale"). Thus, as no new entity is introduced and the LLC continues in existence after the acquisition of a 100-percent membership interest, the reasoning from *Corporate Express* would similarly be applied in Nevada to the sale of LLC membership interests. *See Corporate Express*, 847 So. 2d at 411-12. Accordingly, we conclude that the district court erred in relying on *Traffic Control* to deny ECM's motion for a preliminary injunction because Gilmore's employment agreement was enforceable by ECM without an assignment clause.

Nevertheless, the district court's decision to deny the request for a preliminary injunction was also based upon its conclusion that "[s]ufficient evidence was not presented by [ECM] to show irreparable harm for which compensatory damages [were] an inadequate remedy."

SUPREME COURT
OF
NEVADA

(O) 1947A

Thus, we next address whether the district court abused its discretion in making that determination.

*ECM failed to show it would suffer irreparable harm for which compensatory damages would not suffice*

ECM contends that "[n]umerous other courts have held that when a former employer solicits clients in breach of a noncompetition agreement, the breach results in irreparable harm to the former employer." In doing so, ECM urges this court to presume irreparable harm resulting from the loss of several of its customers. We decline to do so.

Irreparable harm is an injury "for which compensatory damage is an inadequate remedy." *Dixon v. Thatcher*, 103 Nev. 414, 415, 742 P.2d 1029, 1029 (1987). Other jurisdictions have held that where a party competes with the former employer despite a restrictive covenant, or an employee misappropriates trade secrets or confidential customer information, courts may presume irreparable harm. *See Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) ("Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm."); *Hillard v. Medtronic, Inc.*, 910 F. Supp. 173, 179 (M.D. Pa. 1995) ("To the extent that the restrictive covenant is being violated, [the former employer] is suffering irreparable harm by the potential loss of customers posed by [the former employee]'s activities."). Irreparable harm is also presumed where a party misappropriates a trade secret. *Johnson Controls*, 323 F. Supp. 2d at 532-33. This presumptive rule recognizes the difficulty in calculating money damages to redress the loss of a client relationship "that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v.*

*Cohen,* 173 F.3d 63, 69 (2d Cir. 1999). However, "[u]nder limited circumstances, such as where the loss to an employer can be quantified in terms of a specific amount of lost sales, no irreparable harm is threatened." *Johnson Controls,* 323 F. Supp. 2d at 532.

Some courts have clarified that such a presumption is not automatic and irreparable harm ultimately depends on the underlying facts of the case. *See, e.g., Baker's Aid v. Hussmann Foodservice Co.,* 830 F.2d 13, 15-16 (2d Cir. 1987); *Veramark Techs., Inc. v. Bouk,* 10 F. Supp. 3d 395, 400-01 (W.D.N.Y. 2014); *Golden Krust Patties, Inc. v. Bullock,* 957 F. Supp. 2d 186, 194 (E.D.N.Y. 2013). And upon further examination of the cases cited by ECM on appeal and in the district court proceedings, we note that in each case there was undisputed evidence presented to demonstrate that the former employee solicited, and in some cases obtained contracts with, the former employer's customers. *See Ticor,* 173 F.3d at 67 (stating that employee admitted to soliciting business before the six-month noncompete restriction ended); *Johnson Controls,* 323 F. Supp. 2d at 531 (stating that former employees admitted they solicited and provided service to former employer's customers); *Hillard,* 910 F. Supp. at 179 (stating that evidence in the record demonstrated that the former employee was actively soliciting the former employer's customers).

Additionally, where courts have concluded that a loss of client relationships constitutes irreparable harm, those courts have also concluded that the employee provided unique services. *See, e.g., Ticor,* 173 F.3d at 70 ("New York, following English law, recognizes the availability of injunctive relief where the non-compete covenant is found to be reasonable and the employee's services are *unique.*" (emphasis added)); *Johnson Controls,* 323 F. Supp. 2d at 532 ("[W]here an employee with

unique client relationships violates a non-compete clause, injunctive relief is ordinarily appropriate because if the unique services of such employee are available to a competitor, the employer obviously suffers irreparable harm." (internal quotation omitted)).[1] In the instant case, although Gilmore was employed by ECM for seven years, based on the evidence in the record, it does not appear that Gilmore's job as a condominium and HOA manager required any "unique" skills.

Furthermore, there is conflicting evidence in the record as to whether Gilmore solicited or directly provided services to any of ECM's customers. ECM argued that Gilmore had solicited business from ECM clients and disclosed confidential information. ECM provided a declaration from its president alleging that 3 of the 11 associations that Gilmore managed while at ECM had terminated their contracts with ECM and hired Mesa, and two other associations were in the process of terminating their service contracts with ECM and were considering Mesa as an alternative at the time the litigation commenced.

ECM's president also asserted in her declaration that Gilmore and Mesa improperly engaged in discussions with two other ECM-managed HOAs. In support of this contention, ECM presented evidence of an e-mail exchange between Gilmore and a board member of the Ventana

---

[1]Other courts have analyzed the "unique" factor as part of the reasonableness or validity of a restrictive covenant. *See, e.g., 7's Enters., Inc. v. Del Rosario*, 143 P.3d 23, 29-32 (Haw. 2006) (adopting unique or specialized training requirement as part of reasonable test for noncompetition clauses); *Sys. Concepts, Inc. v. Dixon*, 669 P.2d 421, 426 (Utah 1983) (holding that to obtain injunctive relief, employer must show covenant is necessary to protect the goodwill of the business and that employee's services were unique).

Canyon HOA that alluded to Gilmore hoping to remain the association's manager. And the ECM president alleged that while attending an HOA meeting for another ECM client, a Mesa representative solicited the HOA and implied that although Gilmore could not be the community manager, Mesa intended to have Gilmore work on their account "behind the scenes."

Gilmore and Mesa countered by providing declarations from various board members of the HOAs that Gilmore had represented and managed while employed at ECM and which subsequently left ECM. All asserted that the reason their associations terminated their contracts with ECM was because of ECM's change in ownership from the McCaffertys to FSRM, not because Gilmore had solicited their business. In response to the e-mail with the Ventana Canyon board member, Gilmore explained that the board member voluntarily disclosed to her that Ventana had already decided to terminate ECM and had solicited proposals from other management companies, including Mesa. In response to ECM's allegation that Mesa's president stated that Gilmore could work "behind the scenes," Mesa submitted an affidavit from its president wherein she stated that she told the HOA that Gilmore could not be their community manager and did not indicate that Gilmore would work behind the scenes.[2] Furthermore, Gilmore and Mesa demonstrated that no confidential information was shared. The information allegedly revealed consisted of the names of the HOAs Gilmore managed at the time she was terminated, which was available to the public on the Secretary of State's website.

---

[2]While there is discrepancy as to whether Mesa stated that Gilmore would assist with the contract, this court will not reweigh the credibility of witnesses on appeal. *Castle v. Simmons*, 120 Nev. 98, 103, 86 P.3d 1042, 1046 (2004).

SUPREME COURT
OF
NEVADA

(O) 1947A

Unlike the cases ECM cites, Gilmore and Mesa have not conceded that there was a breach of a restrictive covenant. To the contrary, the facts here are disputed, and the district court eventually found that Gilmore did not solicit the HOAs identified during the preliminary injunction hearing. The district court further found that, unlike many of the cases cited by ECM, if ECM is successful in its case, ECM's damages were quantifiable for customers it had lost to date. Thus, the court concluded that the evidence was insufficient to demonstrate irreparable harm.

We conclude that the district court did not abuse its discretion in denying ECM's motion for a preliminary injunction on the basis that ECM failed to show that it would suffer irreparable harm for which compensatory damages were not an adequate remedy if the district court did not enter a preliminary injunction. *See Boulder Oaks*, 125 Nev. at 403, 215 P.3d at 31 (providing that this court reviews a district court's decision regarding a preliminary injunction for an abuse of discretion).

Accordingly, we affirm the district court's order denying the request for a preliminary injunction.

_____, C.J.
Hardesty

We concur:

_____, J.
Parraguirre

_____, J.
Cherry